Filed 10/31/14  P. v. Madrid CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B246626 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA090086) |
| v. | |
| MICHAEL MADRID et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  Tia Fisher, Judge.  The judgments are affirmed as modified.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant Michael Madrid.

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Ramos.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb, Supervising Deputy Attorney General, Taylor Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

Appellant Michael Madrid was convicted by jury of five counts of attempted murder. The jury found gun use allegations under Penal Code section 12022.53, subdivisions (b), (c), (d) and (e) to be true, as well as a gang allegation under Penal Code section 186.22, subdivision (b)(4).

Codefendant, Francisco Ramos, was convicted by jury of two counts of attempted murder. The jury found the same gun use and gang allegations to be true as to Ramos.

Both appellants contend their right to due process was violated by the giving of instructions on a kill zone theory that was not supported by the evidence. Additionally, Madrid contends that his sentence of 50 years to life constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

## BACKGROUND

On March 13, 2010, around 10:30 or 11:00 p.m., a group of people were standing outside in a corridor between two apartment buildings on South Buena Vista in Pomona. They had been guests at a baby shower for Crystal Medrano that had just ended. The group included Crystal Medrano, Deanna Campos (Medrano's sister), David Campos (Deanna's husband), and Javier Acevedo.

There was a driveway on one side of the corridor and a walkway with a fence and bushes on the other.

Crystal Mejia drove to the location with her sister, Candace Salazar, and her uncle, Jaime Arellano. They joined the group in the corridor. Crystal Medrano was sitting with her sister, Mejia and Salazar while the three men were standing a short distance away. Mejia saw someone come up the driveway wearing a black baseball cap with a yellow letter "P" on it. (In court she identified the person as codefendant Michael Madrid.) She heard him say "'This is Happy Town. Fuck Twat Street.'" She saw Madrid pull a gun out of his waistband and she immediately started running. As Mejia was running she heard about five gunshots. About 10 seconds later, she saw Madrid pointing the gun at her so she turned the other way and shielded her face with her arm. A few seconds later, she started hearing shots again so she turned back toward Madrid and saw him walking down the walkway shooting toward the other people in the group who were running

2

away.  Madrid was about 10 feet from Crystal Medrano and Deanna Campos when he shot at them as they ran down the corridor.

Mejia testified that she heard about 14 gunshots that sounded as if they were coming from different guns.  One was very loud, "like a loud boom" while the other was more of a "popping noise."

After Mejia heard the gunshots stop, she saw Madrid run around the back of the apartment building.

Later that night, Mejia told an officer who responded to the location that she was unsure she could identify the shooter.  She was scared and feared for her safety.  The day after the shootings she was shown a series of photographs but was unable to make an identification.  About 10 days later she was shown more photographs and identified Madrid as the shooter.  At the preliminary hearing both Mejia and Medrano identified Madrid as the gunman.

Crystal Medrano was sitting with the other women when she noticed someone outside the fence looking at them.  The person came up the driveway and said to the group of men, "'Fuck 12th Street, Happy Town,'" or "'Happy Town, Fuck 12th Street.'"  Medrano turned to look at him and saw him pull out something from his waistband, point a gun at the group and begin shooting.

As soon as she saw the gun, Medrano started to run toward her sister's apartment which was located in the middle of the apartment building to the left of the corridor.  As she was running she saw another person at the back of the building pointing a gun; she could not actually see the person, but she could see "sparks coming out of a gun."  She heard between 14 and 16 gunshots and was hit in her stomach.

Deanna Campos[1] saw a person walk by who gave the group "an ugly look."  Seconds later, she saw that same person come around the corner, approach them and say "Fuck 12th Street.  This is Happy Town."  She saw that he was struggling with something in his waistband and thinking it was probably a gun, she took off running along with her

---

[1] For clarity, we will refer to David and Deanna Campos by their first names.

3

sister. As she was running she saw a second person on the walkway. She heard 12 to 15 gunshots that did not sound as if they all came from the same gun. Deanna was unable to identify either person.

Deanna was shot twice, once in her left elbow and the other in her knee. She fell to the ground after her leg was hit. She was in the hospital almost a month due to her injuries. She has had two surgeries on her knee and still does not have full use of her leg. Her elbow was shattered in four places and also required two surgeries. She does not have full use of her left arm and because she is left-handed, she had to learn to do things with her right hand. She is in constant pain because two nerves in her arm were hit.

David Campos saw two individuals come up the walkway. He noticed that one of them "was reaching for his waistband struggling to pull something out." Although he had a lot of beer that night and was intoxicated, he ran. He saw flashes of light reflected on the apartment as he was running away and heard several gunshots. He also heard them saying "Fuck Happy Town, 12th Street." David was shot three times, once in his chest, once in his lower abdomen and once in his left hand. He was unable to bend two of the fingers on his left hand as a result of the gunshot wounds.

Javier Acevedo did not see the person walk up to the group. He was shot four to five times. He was struck twice in the chest and once on his right hand. He was in the hospital for about a month and had surgery to remove rounds or shrapnel from his body.

Jaime Arrellano was shot in the right hip.

Andrew Bebon, a homicide detective with the Pomona Police Department was assigned to investigate the shooting at the apartments on South Buena Vista. He found bullet fragments and saw bullet strikes on the walls, but did not find any bullet strikes on the ground.

Detective Bebon put together a packet of six photographs containing Madrid's photo and showed them to Crystal Mejia the day after the shooting. She looked at two photos specifically, one of which was Madrid's photo, focusing on skin color, eyebrows, mustache and shape of face. Mejia concluded that "[she] can't be sure" and did not make an identification.

4

About 10 days later, Detective Bebon showed Mejia a set of 18 photographs, again containing Madrid's photo. She went through them one by one and put aside a couple that she wanted to look at again more closely. When she saw Madrid's photo (a different photo from the one in the first set) she immediately set it aside, saying "'Oh, yeah.'" When she looked at the photo later she told Bebon "it made her sick to her stomach looking at it." She initialed the photo, identifying Madrid as the shooter she saw.

Detective Bebon eventually interviewed Madrid and Ramos. Madrid identified himself as a member of the Happy Town Pomona gang with the gang moniker of Gizmo. He told Bebon that he had been in the gang four years, i.e., since he was 11 years old. Ramos also identified himself as a member of Happy Town with the moniker Slow. Ramos admitted to the March 13 shooting, stating that he "stayed up near the corner of the building" and fired approximately three to four rounds "towards the ground" so "as to not be shooting at anybody."[2] Bebon had not found any ricochet marks on the ground during his investigation of the location.

Michael Lange, a detective with the Pomona Police Department, testified as a gang expert. After working on various gang task forces with the Los Angeles Police Department, Lange transferred to the Pomona Police Department in 2000. In 2002, he became a gang unit officer, investigating street level gangs, developing intelligence and providing expertise. He was promoted to detective in 2005 and was appointed a gang detective. He was also assigned to work with the FBI on violent street gangs. Detective Lange was familiar with the Happy Town gang through his interactions with gang members and investigation of crimes in which Happy Town gang members were suspects or victims.

Detective Lange indicated that gang members are identified by their own admission, through investigation, who they are with, tattoos or wearing a symbol associated with a gang. The membership of a gang included both members and

---

[2] Ramos's statements were admitted against him alone.

associates. Associates are not allowed to have gang tattoos if they "haven't been fully jumped in."

Detective Lange testified about Happy Town's tattoos, hand signals and primary activities. The gang was known for "simple assaults, batteries, possessions of weapons, narcotics, sales of narcotics, assault with deadly weapons, attempt[ed] murders, murders, carjacking and witness intimidation." He further testified about two murders committed by Happy Town members in 2007 and 2008. He identified the apartment complex where the shootings occurred as the border between the Happy Town street gang and Pomona 12th Street gang.

Detective Lange was familiar with Madrid. Madrid admitted being a member of Happy Town. Lange testified about the various tattoos that Madrid had, including a large "H" with the word "Town" within it. He also looked at photographs of Ramos's tattoos and identified them as gang-associated.

Based on his tattoos, his admissions and who he had associated with in the past, Lange opined that Madrid was an active Happy Town gang member. Similarly, based on his tattoos and his admission, Lange opined that Ramos was an active member of that gang.

Using a hypothetical based on the facts in this case, the prosecutor asked Lange whether it was his opinion that the crimes had been committed for the benefit of a gang. Lange replied "that it not only benefits Happy Town gang, but it also benefits each individual that participated."

He explained that "[r]espect is the most important thing as a gang member and to a gang," along with fear, intimidation and retaliation. Gangs need respect from the community in which they live and from other gang members in order to operate their criminal enterprise. "They utilize respect and fear to not only conduct themselves as a criminal enterprise but also to flourish." If someone disrespects them, there would be some form of retaliation.

Lange further explained that a gang member that called out his gang's name and used a firearm would gain more respect within the gang and his stature "would rise

6

significantly as a result." Additionally, people in the community would talk about the incident, raising the level of respect and fear of that gang in the community. As a result, "a lot of people don't want to come forward and talk to the police . . . ."

Madrid and Ramos were tried together, but with separate juries. Madrid was found guilty on all five counts of attempted murder while Ramos was convicted of two counts. The jury was deadlocked on the remaining counts against Ramos so the trial court declared a mistrial as to them and then dismissed them pursuant to plea negotiations. Gun use and gang allegations were found true as to both defendants. Madrid, a minor at the time of the offense, was sentenced to 50 years to life with the possibility of parole; Ramos was sentenced to two consecutive life terms with the possibility of parole, plus 50 years to life. Each filed a timely appeal.

## DISCUSSION

### 1.    Kill Zone Jury Instruction

Appellants argue insufficient evidence supported the trial court's instruction on attempted murder based on a kill zone theory.[3] This argument is without merit.

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.] We review the trial court's decision de novo. In so doing, . . . we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt" that appellants committed attempted murder based on a kill zone theory. (*People*

---

[3] The jury was given the following instruction: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND 2. The defendant intended to kill a person. [¶] . . . [¶] A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity."

*v. Cole* (2004) 33 Cal.4th 1158, 1206; Pen. Code, § 1093.) That determination must be made without reference to the credibility of the evidence. (*People v. Marshall* (1996) 13 Cal.4th 799, 847.)

We first consider the mental state required for attempted murder, which "has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327 (*Bland*).) "In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "The mental state required for *attempted* murder is further distinguished from the mental state required for murder in that the doctrine of 'transferred intent' applies to murder but not attempted murder." (*Id.* at pp. 739-740.) "In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder." (*Bland*, *supra*, 28 Cal.4th at p. 317.) In contrast, "'[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.'" (*People v. Smith*, *supra*, 37 Cal.4th at pp. 739-740.)

Under a concurrent intent or kill zone theory, however, a defendant may be guilty of the attempted murder of victims who were not the defendant's primary target but were located within the kill zone. (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798, review den. Mar. 13, 2013.) This occurs "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary

8

victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.'" (*Bland*, *supra*, 28 Cal.4th at pp. 329-330.) "In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that *everyone* in the kill zone die." (*People v. McCloud*, *supra*, 211 Cal.App.4th at p. 798.) A rational jury may infer this specific intent "from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm." (*People v. Adams* (2008) 169 Cal.App.4th 1009, 1023.)

Substantial evidence supports the trial court's instruction on attempted murder based on a kill zone theory. Appellants, members of the Happy Town gang, approached a group of people standing in a corridor next to an apartment complex located on the border between the Happy Town gang's and Pomona 12th Street gang's territories. Madrid approached the group from one end of the corridor via a driveway, while Ramos approached the group from the other end of the corridor via a walkway. Madrid walked up to the men in the group and said something like "Fuck 12th Street, Happy Town" or "Fuck 12th Street. This is Happy Town." He then pulled out a gun and started shooting at the group. As the victims ran, they saw sparks flying from Ramos's gun at the other end of the corridor. Between 10 and 16 shots were fired, which hit five of eight people in the corridor. No evidence indicated any of the bullets were fired at the ground rather than at people, as one appellant contended. From this evidence, the jury could draw a reasonable inference, in light of the direction of the shots, the number of shots, and the way in which appellants approached the corridor each using a gun, that defendants harbored a specific intent to kill every living being between them. (See *People v. Vang* (2001) 87 Cal.App.4th 554, 563-564 [finding the jury "drew a reasonable inference, in light of placement of the shots, the number of shots and the use of high-powered, wall-piercing weapons that defendants harbored a specific intent to kill every living being within the residences" at which they shot].)

9

Appellants argue the kill zone theory is inapplicable because no evidence indicated a primary target existed. We disagree. A jury could reasonably infer that Madrid's act of approaching the men and saying "Fuck 12th Street. This is Happy Town" suggested appellants specifically targeted the men in the group thought to be associated with a rival gang.

Appellants next argue the kill zone theory was inapplicable because Mejia reported Madrid walked methodically down the corridor shooting directly at individuals, and when he approached her, he pointed his gun at her but did not shoot, thereby indicating appellants specifically targeted individuals rather than attempted to kill everyone in the corridor to ensure they killed a specific individual. But Mejia reported she saw Madrid walk down the corridor shooting at individuals *after* she heard five gunshots. Other witnesses also testified Madrid approached, pointed a gun at the group, and started shooting. As they ran away, they saw Ramos also shooting at the group. Even if the jury found appellants *primarily* targeted certain individuals rather than everyone in the corridor, it could reasonably also have found a *concurrent* intent to kill everyone when appellants first approached from either end of the corridor and fired a flurry of bullets, thereby creating a kill zone. (See *Bland*, *supra*, 28 Cal.4th at pp. 330-331, fn. omitted.) Because the jury could infer appellants had the requisite specific intent to kill five individuals at the time they fired at least five bullets at the group, it is of no consequence that Madrid later only targeted specific individuals. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 937 [requiring "a temporal concurrence between the required mental state and the outward actions of the defendant"].)

Appellants rely on *People v. McCloud*, *supra*, 211 Cal.App.4th 788 to argue the evidence failed to establish appellants had the specific intent to kill everyone because they specifically targeted individuals. *McCloud* is distinguishable. There, the prosecution used the kill zone theory to support 46 attempted murder convictions where defendants fired 10 shots into a party of over 400 people after one defendant had been punched, contending defendants created a kill zone containing 46 people in the line of fire. (*Id.* at pp. 793-795, 799-803.) Noting that the kill zone theory is inapplicable "if the

10

evidence shows only that the defendant intended to kill a particular targeted individual . . . in a manner that subjected other nearby individuals to a risk of fatal injury," the court held the trial court erred in instructing the jury on the kill zone because no evidence indicated defendants tried to kill the person who punched one defendant by killing all 46 people in the area where the assailant was located. (*Id.* at pp. 798-800.) Unlike in *McCloud* in which it would have been unreasonable for a jury to infer defendants had the specific intent to kill 46 people by firing only 10 bullets, here the jury could reasonably infer that appellants had the specific intent to kill five of eight people in the corridor by firing 10 to 16 bullets at them. The kill zone instruction was therefore proper.

2.     **Cruel and Unusual Punishment Under the Eighth Amendment**

      A.     **Madrid's Sentence of 50 Years to Life Affording Him an Initial Parole Hearing at 66 Violates the Eighth's Amendment Prohibition on Cruel and Unusual Punishment**

      Appellant Madrid, a minor age 15 at the time of the offense, argues his sentence of 50 years to life constitutes the functional equivalent of life without parole amounting to cruel and unusual punishment under the Eighth Amendment of the United States Constitution. We agree, but conclude newly enacted Penal Code section 3051 cures this constitutional violation.

      The Eighth Amendment's prohibition on cruel and unusual punishment prohibits punishment that is grossly disproportionate to the offender's culpability. (U.S. Const., 8th Amend.) In the context of juvenile offenders, because they "cannot with reliability be classified among the worst offenders," categorical rules have developed to prevent the imposition of disproportionate punishment. (*Roper v. Simmons* (2005) 543 U.S. 551, 569.)

      In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the Supreme Court held a nonhomicide juvenile offender may not be sentenced to life without parole (hereafter LWOP). (*Id.* at p. 74.) The Court required juvenile offenders be given "some

11

meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" absent exceptional circumstances.  (*Id.* at p. 75.)

In *Miller v. Alabama* (2012) 132 S.Ct. 2455 (*Miller*), the Supreme Court prohibited sentencing a juvenile homicide offender to mandatory LWOP and required the sentencing court to consider the mitigating qualities of youth, including:  (1) age and its hallmark features such as immaturity, impetuosity, and failure to appreciate risk and consequences; (2) family and home environment; and (3) circumstances of the homicide offense, including the extent of participation and familial or peer pressure.  (*Id.* at pp. 2467-2468, 2475.)

Following *Graham* and *Miller*, in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court prohibited a term-of-years sentence that amounts to the "functional equivalent" of LWOP for juvenile nonhomicide offenders. (*Id.* at pp. 267-268.)  The court explained the Eighth Amendment requires that at sentencing, a juvenile nonhomicide offender must be provided with "a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future," and "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development."  (*Id.* at pp. 268-269.)

In developing these rules, the courts relied on three fundamental differences between juveniles and adults to conclude juveniles are constitutionally different from adults for sentencing purposes.  (*Graham*, *supra*, 560 U.S. at p. 68.)  First, as compared to adults, "children have a '"lack of maturity and an underdeveloped sense of responsibility,"' leading to recklessness, impulsivity, and heedless risk-taking.  [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings.  [Citation.]  And third, a child's character is not as 'well formed' as an adult's;

12

his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" (*Miller*, *supra*, 132 S.Ct. at p. 2464.)

Because of these characteristics, "'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.'" (*Graham*, *supra*, 560 U.S. 48, 68.) Yet, "a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Id.* at p. 70.) Accordingly, "appropriate occasions for sentencing juveniles to [LWOP or its functional equivalent] will be uncommon." (*Miller*, *supra*, 132 S.Ct. at p. 2469.)

In the wake of these recent cases, "[t]he issue of how long someone under the age of 18 may be sentenced to prison has been the subject of considerable judicial attention." (*People v. Perez* (2013) 214 Cal.App.4th 49, 55.) A long sentence with eligibility for parole will be constitutional "*if* there is some meaningful life expectancy left when the offender becomes eligible for parole." (*Id.* at p. 57 [no case has struck "down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole"].) How much life expectancy must remain at the time of parole eligibility remains unclear. (See *People v. Solis* (2014) 224 Cal.App.4th 727, 819, review granted June 11, 2014, S218757 [sentence allowing for parole eligibility at age 68 constituted the functional equivalent of LWOP]; *People v. Perez*, *supra*, 214 Cal.App.4th at pp. 57-58 [sentence allowing for parole eligibility at age 47 did not constitute the functional equivalent of LWOP].)

It is undisputed that Madrid committed the crime when he was 15 years old and under his sentence, he would first become eligible for parole at the age of 66. Madrid argues his sentence offers him no realistic opportunity for release during his lifetime.[4] He contends that, considering the reduced life expectancy that results from incarceration,

---

[4] At sentencing, the parties stipulated that the Social Security actuarial table indicated Madrid's life expectancy was 81.7 years.

he will have no meaningful chance at life after parole before he reaches his life expectancy, assuming he even survives long enough to reach his first parole eligibility date.  (See *People v. Solis*, *supra*, 224 Cal.App.4th at p. 819.)

"[L]ife expectancy projections derived on appeal [have varied] widely in recent juvenile LWOP cases," from as high as 80 years for an 18-year-old defendant to as low as 64.6 years for a 17-year-old defendant.  (See *People v. Gonzalez* (2014) 225 Cal.App.4th 1296, 1307, review granted July 23, 2014, S219167; *People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [life expectancy for an 18-year-old male is 76 years] [citing National Center for Health Statistics, Centers for Disease Control, National Vital Statistics Reps. (June 28, 2010) table 2, vol. 58, No. 28 and *People v. Romero* (2002) 99 Cal.App.4th 1418, 1427-1428]; *People v. Solis*, *supra*, 224 Cal.App.4th at p. 734, fn. 2 [life expectancy for a 17-year-old is 72 years based on actuarial tables].)

Assuming a mid-range life expectancy of 76, Madrid's initial parole hearing at age 66 is too late to ensure a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  (*Graham*, *supra*, 560 U.S. at p. 75.)  Madrid's sentence offering him his first chance at parole in his mid-sixties affords him little opportunity to become a contributing member of society.  Rather, it constitutes an impermissible judgment on his value and place in society that deprives him of a meaningful opportunity to demonstrate his rehabilitation and fitness to reenter society in the future.  (*Id.* at p. 74; *Caballero*, *supra*, 55 Cal.4th at p. 268.)  Madrid's sentence therefore conflicts with the mandate of *Graham*, *Miller*, and *Caballero* that absent exceptional circumstances, juvenile offenders must be afforded a realistic possibility of life outside of prison as a reformed individual.  "Although proper authorities may later determine that [Madrid] should remain incarcerated for [his] natural [life]," standing alone Madrid's sentence of 50 years to life constitutes the functional equivalent of LWOP in violation of the Eighth Amendment.  (*Caballero*, *supra*, 55 Cal.4th at p. 268.)

14

**B. Newly Enacted Penal Code Section 3051 Cures the Constitutional Violation**

Although we conclude Madrid's sentence violates the Eighth Amendment, newly enacted Penal Code section 3051 cures this constitutional deficiency. In response to *Graham*, *Miller*, and *Caballero*, the Legislature enacted Senate Bill No. 260 (Sen. Bill 260) to establish Penal Code section 3051 addressing juvenile sentencing concerns, effective January 1, 2014.[5] Section 1 of Senate Bill 260 states in relevant part: "The Legislature finds and declares that, as stated by the United States Supreme Court in [*Miller*], 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*] and [*Miller*]." (Legis. Counsel's Dig., Sen. Bill No. 260 (2013-2014 Reg. Sess.) § 1, pp. 2-3.) The Legislature declared its intent "to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (*Ibid.*)

---

[5] Senate Bill 260 was passed after the California Supreme Court in *Caballero* urged "the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5.)

Penal Code section 3051 provides in pertinent part that subject to inapplicable exceptions, "[a] person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (Pen. Code, § 3051, subds. (b)(3), (h).) "The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release" and "take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (Pen. Code, § 3051, subds. (e), (f)(1).)

California Courts of Appeal disagree as to the effect of Penal Code section 3051 on sentences in violation of the Eighth Amendment.[6] In *In re Alatriste*, *supra*, 220 Cal.App.4th 1232, the court reasoned that "*Graham*, *Miller* and *Caballero* merely hold that a juvenile defendant may not be incarcerated for life or its functional equivalent

_____

[6] Of nine published cases addressing the issue, five conclude Penal Code section 3051 cures any constitutional violation. (See *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214960; *People v. Martin* (2013) 222 Cal.App.4th 98, review granted Mar. 26, 2014, S216139; *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699; *People v. Gonzalez*, *supra*, 225 Cal.App.4th 1296, review granted July 23, 2014, S219167; *People v. Saetern* (2014) 227 Cal.App.4th 1456.) Furthermore, as of the time of this writing, seven unpublished cases have concluded Penal Code section 3051 cures any constitutional deficiencies. (See *People v. Bautista* (Jan. 10, 2014, B244063); *People v. Patton* (May 8, 2014, B246498); *People v. Recarte* (June 17, 2014, B245867); *People v. Hart* (June 25, 2014, G047156); *People v. Gutierrez* (Mar. 27, 2014, B244448); *People v. Sandoval* (Apr. 30, 2014, G047431); *People v. Caballero* (Aug. 19, 2014, B248232).)

On the other hand, four published cases and one unpublished case conclude Penal Code section 3051 fails to ameliorate any constitutional deficiency in sentencing. (See *In re Heard* (2014) 223 Cal.App.4th 115, review granted Apr. 30, 2014, S216772; *In re Rainey* (2014) 224 Cal.App.4th 280, review granted June 11, 2014, S217567 [approving of *In re Heard*, *supra*, 223 Cal.App.4th 115 in dicta]; *People v. Solis*, *supra*, 224 Cal.App.4th 727, review granted June 11, 2014, S218757; *People v. Garrett* (2014) 227 Cal.App.4th 675; *People v. Espinoza* (Jan. 31, 2014, H038508).)

without some meaningful opportunity for release on parole during his or her lifetime. These cases do not require that the time when that meaningful opportunity might occur should be determined at the time of sentencing." (*Id.* at p. 1240.) The new procedure under Penal Code section 3051 therefore provides juveniles with the requisite opportunity compelled by these judicial decisions by affording them a meaningful chance to obtain release based on demonstrated maturity and rehabilitation. (*In re Alatriste*, *supra*, 220 Cal.App.4th at p. 1240; accord, *People v. Martin*, *supra*, 222 Cal.App.4th 98.)

Similarly, in *People v. Franklin*, *supra*, 224 Cal.App.4th 296, the court concluded that "[w]hile an effective LWOP sentence imposed prior to the enactment of Penal Code section 3051 may have violated constitutional restrictions when rendered, the new section has provided the parole opportunity that was constitutionally lacking." (*Id.* at p. 306.) The court agreed with the court in *In re Alatriste*, *supra*, that *Graham*, *Miller*, and *Caballero* do not require "the trial judge at the time of initial sentencing to make a determination as to when a particular juvenile offender should become eligible for parole consideration," and noted the procedure under section 3051 allowed parole eligibility to be considered more intelligently and more fairly than if predicted at the time of sentencing. (*People v. Franklin*, *supra*, 224 Cal.App.4th at p. 306; see *People v. Gonzalez*, *supra*, 225 Cal.App.4th at pp. 1310-1311 [application of section 3051, which makes the defendant eligible for parole at age 46, results in a sentence that does not constitute the functional equivalent of LWOP and therefore *Graham*, *Miller*, and *Caballero* do not apply].)

In contrast, the court in *In re Heard*, *supra*, 223 Cal.App.4th 115 disagreed with the conclusion of these opinions on the ground that it allowed the sentencing court to disregard its constitutional duty at sentencing to consider the differences between juveniles and adults established in *Graham*, *Miller*, and *Caballero*. (*In re Heard*, *supra*, 223 Cal.App.4th at pp. 130-131.) The court interpreted Penal Code section 3051 as a "'safety net' to guarantee a juvenile offender the opportunity for a parole hearing during his or her lifetime" that did not relieve the sentencing court of its duty to impose a constitutional sentence for a juvenile defendant. The court reasoned its conclusion was

17

made "all the more true because there is no guarantee that [section 3051] will remain in existence when [a defendant] would be eligible to benefit from it." (*In re Heard*, *supra*, 223 Cal.App.4th at pp. 130-131; see *People v. Garrett*, *supra*, 227 Cal.App.4th 675, 688-689 ["[t]he statutory promise to have a future parole board review an improperly considered sentence does not cure the constitutional error" because it cannot substitute for the sentencing court's required consideration of the factors of youth and maturity at the time of sentencing].)

Likewise, in *People v. Solis*, *supra*, 224 Cal.App.4th 727, the court agreed with *In re Heard* that Penal Code section 3051 should act as "a safety net" rather than a "cure-all" for juvenile sentences that violate the Eighth Amendment, for fear that trial courts may forgo applying the principles of *Graham*, *Miller*, and *Caballero*. (*People v. Solis*, *supra*, 224 Cal.App.4th at p. 736.) The court then determined that because the defendant's juvenile characteristics were considered at the sentencing hearing, it could cure any constitutional defect by modifying the sentence to reflect the defendant was entitled to a parole hearing after serving 25 years in prison. (*Id.* at pp. 736-737.)

In our view, Penal Code section 3051 as applied to Madrid's sentence satisfies the constitutional mandates articulated in *Graham*, *Miller*, and *Caballero*. These judicial decisions articulate that because of the differences between juveniles and adults, juveniles are less deserving of the worst punishments. (*Graham*, *supra*, 560 U.S. at p. 68.) Accordingly, in considering a juvenile's sentence, the sentencing court must take into account the characteristics of youth that may mitigate the justifications for imposing the harshest penalties. (*Miller*, *supra*, 132 S.Ct. at p. 2468.) Absent exceptional circumstances, a sentence will be overly harsh, and thus constitute cruel and unusual punishment, when it acts as the functional equivalent to LWOP by affording no meaningful opportunity for parole within the juvenile's life expectancy. (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)

Under Penal Code section 3051, Madrid will receive a parole hearing in his 25th year of incarceration, at the age of 40. At his parole hearing, the Board of Parole Hearings will "take into consideration the diminished culpability of juveniles as

compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual" in considering Madrid's release. (Pen. Code, § 3051, subds. (e), (f)(1).) Section 3051 thus provides Madrid with a meaningful opportunity to obtain release based on demonstrated growth and rehabilitation by affording him his first parole hearing well within his life expectancy. Therefore, under the new legislation, Madrid's sentence is not the functional equivalent of LWOP. Without a sentence that amounts to the functional equivalent of LWOP, no harm exists that constitutes cruel and unusual punishment under the Eighth Amendment.

Moreover, the record reveals the trial court considered Madrid's age, immaturity, and history of substance abuse and gang involvement at sentencing. The sentencing court indicated it considered Madrid's probation report, handwritten letters from family members, and the parties' sentencing memorandum regarding Madrid's background. In determining Madrid's sentence, the court considered Madrid's difficult childhood and early gang involvement, his criminal activity beginning at age 12, his educational background and low IQ, and his drug use beginning at age 10. This alleviates any concern that Madrid may be prejudiced by the lack of opportunity to develop a record at sentencing regarding his youthful characteristics that may be considered at his parole hearings in the future. (See *People v. Garrett*, *supra*, Cal.App.4th at p. 689 [without proper evaluation by the sentencing court, a juvenile offender will be disadvantaged when attempting to meet their burden to show growth and maturity during later youth parole hearings].) The parole hearing procedure under Penal Code section 3051 will thus permit a comprehensive evaluation of Madrid's growth and maturity and provide him a meaningful opportunity for release.

We therefore conclude that with the imposition of Penal Code section 3051 affording Madrid the opportunity for a parole hearing in his 25th year of incarceration, Madrid's sentence will satisfy the constitutional requirements of *Graham*, *Miller*, and *Caballero* because he will receive his first opportunity for parole well within his life expectancy. However, we must ensure a defendant receives a constitutional sentence *at the time of sentencing*. (See *Caballero*, *supra*, 55 Cal.4th at p. 268.) Accordingly, out of

19

an abundance of caution, we will modify his sentence to include a minimum parole eligibility date of 25 years.  We can thus conclude with certainty that Madrid has been provided with a sentence that passes constitutional muster.

## DISPOSITION

Madrid's sentence is modified to reflect he shall be entitled to a parole hearing after serving 25 years in prison.  The clerk of the trial court is directed to prepare a new abstract of judgment with this modification and to send a certified copy thereof to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


JOHNSON, J.